Nathan W. Kellum*
TN Bar #13482, MS Bar #8813
nkellum@crelaw.org
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38117
Telephone: (901) 684-5485
Facsimile:  (901) 684-5499
*Application for Admission *Pro Hac Vice* filed concurrently

Brian R. Chavez-Ochoa,
California State Bar # 190289
brianr@chavezochoalaw.com
Chavez-Ochoa Law Offices, Inc.
4 Jean Street, Suite 4
Valley Springs, CA 95252
Telephone: (209) 772-3013
Facsimile: (209) 772-3090

*Attorneys for Plaintiff Donald Harman*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| DONALD HARMAN,<br><br>        Plaintiff,<br><br>vs.<br><br>CITY OF SANTA CRUZ, CALIFORNIA, KEVIN VOGEL, in his official capacity as Chief of Police for the Santa Cruz Police Department; WARREN BARRY, individually and in his official capacity as Lieutenant for the Santa Cruz Police Department; CARTER JONES, individually and in his official capacity as Sergeant for the Santa Cruz Police Department; and IAN BURNHAM, individually and in his official capacity as Officer for the Santa Cruz Police Department,<br><br>        Defendants. | Case No. 5:16-cv-04361<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND NOMINAL DAMAGES**<br><br>**[Civil Rights Suit – 42 U.S.C. §1983]** |

Comes now the Plaintiff, Donald Harman, by counsel, and avers the following:

## I.  INTRODUCTION

1.  This is a civil rights action brought under 42 U.S.C. § 1983 and California State Constitution challenging the constitutionality of Santa Cruz Ordinances §§ 9.36.020 and 9.40.010 *et seq.*, on their face, and as applied to selectively ban Plaintiff Don Harman's religious expression on a public sidewalk in downtown Santa Cruz.

2.  Section 9.36.020 criminalizes noises, including speech, based on the subjective complaints of citizens.  Furthermore, Section 9.40.010 *et seq.* grants police unbridled discretion to grant, deny, and revoke permits that effectively exempt the permittee from a violation of § 9.36.020, allowing § 9.36.020 to be enforced selectively against constitutionally-protected speech in an arbitrary and discriminatory manner.

3.  Plaintiff Donald Harman seeks injunctive relief, declaratory relief, and nominal damages against Defendants City of Santa Cruz, Kevin Vogel, in his official capacity as Chief of Police for Santa Cruz Police Department, Warren Barry, individually and in his official capacity as Lieutenant for the Santa Cruz Police Department, Carter Jones, individually and in his official capacity as Sergeant for the Santa Cruz Police Department, and Ian Burnham, individually and in his official capacity as Officer for the Santa Cruz Police Department.

4.  This action is premised on the United States Constitution and California State Constitution, concerning the deprivation of Plaintiff's fundamental rights to free speech, liberty of speech, due process and equal protection.

5.  Defendants' actions have deprived and will continue to deprive Plaintiff of his fundamental rights as provided in the First and Fourteenth Amendments to the United States Constitution and in Article 1 of the California State Constitution.

**COMPLAINT**

6.      Each and every act of Defendants alleged herein was committed by Defendants named herein, and each and every act was committed under the color of state law and authority.

## II.      JURISDICTION AND VENUE

7.      In addition to the claim brought under California State Constitution, this action also raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

8.      This Court has original jurisdiction over federal claims by operation of 28 U.S.C. §§ 1331 and 1343.   This Court has supplemental jurisdiction over the California State Constitution claims under 28 U.S.C. §§ 1367.

9.      This Court has authority to grant the requested injunctive relief and nominal damages under 28 U.S.C. § 1343, the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202, and costs and attorney's fees under 42 U.S.C. § 1988.

10.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b), because a substantial part of the actions giving rise to this case occurred within the Northern District of California, and all Defendants reside in this district.

## III.      INTRADISTRICT ASSIGNMENT

11.     Assignment to the San Jose Division is appropriate under Civil L.R. 3-2(c) and (e) because a substantial part of the actions giving rise to this case occurred within Santa Cruz.

## IV.      IDENTIFICATION OF THE PARTIES

12.     Plaintiff Donald Harman ("Harman") is and was at all times relevant to this Complaint a resident of Pleasanton, California.

13.     Defendant City of Santa Cruz, California ("Santa Cruz") is a municipal corporation established, organized, and authorized under and pursuant to the laws of the State of

3

**COMPLAINT**

1   California.

2         14.    Defendant Kevin Vogel ("Chief Vogel") is the Chief of Police for the City of

3   Santa Cruz Police Department.  He is sued in his official capacity.  He is responsible for

4   overseeing the enforcement of Santa Cruz ordinances.

5         15.    Defendant Warren Barry ("Lt. Barry")is a Lieutenant for the City of Santa Cruz

6   Police Department.  He is sued in both his individual and official capacities.  He is responsible

7   for enforcing Santa Cruz ordinances and issuing amplification permits.

8         16.    Defendant Carter Jones ("Sgt. Jones") is a Sergeant for the City of Santa Cruz

9   Police Department.  He is sued in both his individual and official capacities.  He is responsible

10  for enforcing Santa Cruz ordinances.

11        17.    Defendant Ian Burnham ("Officer Burnham") is a Police Officer for the City of

12  Santa Cruz Police Department.  He is sued in both his individual and official capacities.  He is

13  responsible for enforcing Santa Cruz ordinances.

14  **V.      STATEMENT OF FACTS**

15  **Harman's Speech**

16        18.    Harman is an evangelical Christian motivated by his faith and love for people to

17  share his earnestly-held Christian beliefs with others in public places.

18        19.    Harman's goal is to share the message of God's salvation, which he refers to as

19  the "gospel," with as many people as possible.

20        20.    Harman's basic message is that everyone has sinned, including him, and all

21  require forgiveness, but God forgives sinners and sent His son Jesus Christ to atone for those

22  sins.

23        21.    To share this salvation message, Harman typically goes to public sidewalks and

24

4

**COMPLAINT**

preaches, that is, he orally and publically proclaims his religious beliefs.  While engaged in this expressive activity, Harman does not wish to yell or shout, but only speak loud enough to be heard by those around him.

22.     Harman prefers to speak in conversational tone in lieu of speaking with a raised voice.  To aid him in this effort, Harman often uses a small personal voice amplifier set to a low volume.  The device lets him speak in a calm, amicable tone and still be heard above noises in the background.

23.     Harman occasionally supplements his public speaking by engaging individuals in one-on-one conversation.  Give-and-take dialogue gives Harman opportunity to answer questions about his Christian faith.

24.     Harman usually stands on a small stepstool when he engages in his expression so he can be seen and heard by passersby.  He always leaves enough room on the sidewalk to allow pedestrians to pass by on the sidewalk.

25.     Harman recognizes that some might not appreciate his message, and some could take offense to his viewpoints, but he does not try to offend or insult anyone.  He wants a share a message of hope and redemption that he genuinely believes people should hear.

26.     Harman does not harass anyone or encourage violence.  He always expresses himself in a peaceful and non-obtrusive manner.

27.     Harman does not solicit funds or membership in any organization.  He seeks nothing in return for his expression.

28.     Harman wishes to travel to downtown Santa Cruz and share his views on public sidewalks there, particularly, on the sidewalks that run alongside Pacific Avenue, during the late afternoons and early evenings on weekends, due to the significant number of people frequent that

**COMPLAINT**

1   area on those dates and times.

2   **Character of Pacific Avenue Sidewalks in Downtown Santa Cruz**

3       29.    Pacific Avenue is a public street located in the center of downtown Santa Cruz

4   and serves as a primary thoroughfare.  It extends northward from Santa Cruz Wharf on the beach

5   and runs parallel to the nearby San Lorenzo River for most of its length.

6       30.    Pacific Avenue is the main commercial strip in downtown Santa Cruz.  The street

7   is lined with antique shops, clothing stores, jewelry stores, surf shops, gift shops, markets,

8   various eateries, two movie theaters, and other commercial establishments.

9       31.    Both sides of Pacific Avenue feature particularly wide city sidewalks.  This is

10  especially true near Pacific Avenue's intersections with Soquel Avenue and Cooper Street,

11  where the sidewalks are approximately 30 to 40 feet wide.

12      32.    On most days and nights, these Pacific Avenue sidewalks are peppered with

13  vendors selling their created wares, encompassing a large variety of goods, including books,

14  paintings, jewelry, and photographs, along with others with tables who distribute political and

15  other forms of literature.

16      33.    Historically, the wide city sidewalks running alongside Pacific Avenue have also

17  been a popular venue for a large number of distinct street performers.

18      34.    The late Tom Scribner, a local musician and activist, regularly played his musical

19  saw for pedestrians in the area for much of the seventies and his likeness is presently

20  memorialized by a bronze sculpture sitting at the 1500 block of Pacific Avenue.  In the early part

21  of their career, the Flying Karamazov Brothers conducted their routines on these city sidewalks.

22  Tom Noddy has used the sidewalk space downtown to present his "Bubble Magic," involving

23  bubble tricks, for decades.  The Bboys of Santa Cruz can be found break-dancing on the Pacific

24

**COMPLAINT**

Avenue sidewalks.  The Santa Cruz Trash Orchestra, a percussion band that uses cans, sheet metal, and hub caps to make music, performs there, as does the Great Morgani (real name Frank Lima), who is frequently seen playing an accordion while wearing some unique costume.

35.    Aside from these celebrities, Pacific Avenue sidewalks further function as a stage for countless, not-so-famous street performers, who regularly busk (perform for tips) for passersby.  The buskers are diverse as they are plentiful, consisting of dancers, acrobats, poets, clowns, magicians, jugglers, puppeteers, and numerous other types of performance artists.

36.    Most of the street performers are musicians.  The area is constantly filled with sounds of music, emanating from jazz, orchestra, bluegrass, rock, and other kinds of bands, brass groups, various percussion groups (some with marimbas (xylophones) and/or maracas and others not), acoustic guitars, mobile pianos, and a large variety of wind instruments (including one gentleman playing a an Australian wind instrument known as didgeridoo), among other types of instrumentation.  Many sing along with their play of musical instruments.  Acapella individuals and groups frequent the area as well.

37.    Due to all the music, singing, occasional poetry readings, and other performances, Pacific Avenue and adjoining sidewalks are accustomed to much commotion and noise, and quite often, loud noise, and especially so, on weekend afternoons and evenings.

38.    Reflecting the Santa Cruz culture, and as part of the city's legacy, the street performances on Pacific Avenue, and the noise that comes with it, are considered a staple of the downtown experience.

39.    Because of this customary environment, the sidewalks of Pacific Avenue welcome a significant amount of visitors and pedestrian traffic, especially on weekend afternoons and evenings.

**COMPLAINT**

**Harman's Speech on Pacific Avenue Sidewalks**

40.     Harman has shared his faith in a number of places, but he primarily wants to witness to people in public areas located within reasonable driving distance from his home in Pleasanton, and offer him a steady flow of pedestrian traffic.  For these reasons, Harman views Pacific Avenue sidewalks in downtown Santa Cruz as exceptionally good spots for his religious expression.

41.     Harman began sharing his Christian faith to people on the Pacific Avenue sidewalks of Santa Cruz in the spring of 2013.  For approximately one year, Harman peacefully expressed his religious message on Pacific Avenue sidewalks in Santa Cruz without incident.  He occasionally encountered passersby who voiced disagreement with message, and others who heckled him, but these exchanges never resulted in physical alterations.  He never experienced any resistance from Santa Cruz police during this time.

**Requirement for, Approval of, and Subsequent Revocation of, Amplification Permit**

42.     However, this started to change in March of 2014, when Harman was approached by a Santa Cruz police officer who advised Harman that he needed a permit from the Santa Cruz Police Department to speak with amplification in public. Harman believed he had a right to speak on a public sidewalk with reasonable amplification without having to obtain a permit in advance, but he did not want to risk arrest, and left.

43.     Subsequently, on April 12, 2014, Harman applied for an amplification permit with the Santa Cruz Police Department.  A few weeks later, on May 1, 2014, Lt. Barry of the Santa Cruz Police Department granted Harman a permit to use amplification on Pacific Avenue sidewalks.

44.     This amplification permit did not have an expiration date, and was intended to

**COMPLAINT**

grant indefinite and open-ended permission to use amplification on Pacific Avenue sidewalks.

45.     With his permit in tow, Harman continued to visit Pacific Avenue sidewalks on a regular basis, especially, on Friday and Saturday nights, and shared his faith via amplification. He did not experience any interference from the police department for the balance of 2014 and for several months in 2015.

46.     On Saturday, May 16, 2015, Harman was approached by Lt. Barry, who informed Harman that he had received anonymous complaints about Harman's expression.  Lt. Barry asked Harman if he could lower the volume of his amplifier.  Harman did not want to cause any problems and willingly agreed to do so.

47.     From that point forward, Harman consciously lowered the volume of his amplifier every time he went on spoke on Pacific Avenue sidewalks, but he was confused by the officer's request.  Harman was willing to lower his volume but he was not given any guidance on how low the amplifier needed to be or at what decibel level his speech needed to be.

48.     Harman also knew the directive was arbitrary because it was premised on anonymous complaints who were likely concerned more about his message than volume level.

49.     The following week, on Saturday, May 23, 2015, Harman went back to the Pacific Avenue sidewalk to preach.  As he had been requested to do, he lowered his amplifier. But, as he was speaking, he noticed a very loud six-member percussion band, playing on Pacific Avenue sidewalk that could clearly be heard from blocks away.  Harman did not understand why he was required to lower his volume while this band could play as loud as they wanted to play.

50.     Despite the discriminatory way in which he and his speech were treated, Harman was still willing to maintain a low level on his amplification device when he spoke and he did this at all times on May 23, 2015.   Harman also went back to the area and shared his views

**COMPLAINT**

1   through a low level of his amplifier again on Friday, June 26, 2015, and then on Friday, July 3,

2   2015.  Harman did not encounter any police officers on any of these occasions.

3         51.    Harman was out on Pacific Avenue sidewalk on July 3, 2015, at the intersection

4   of Soquel Avenue, and began to preach.  But, soon thereafter, a group of Hare Krishnas arrived,

5   playing music, with hand drums and cymbals, and other instruments, along with repetitive

6   chanting, and dancing.  The music was too loud for Harman to be heard there, so he refrained,

7   and moved on to the intersection with Cooper Street, but later on, this same group of Hare

8   Krishna followed him over there and resumed playing music and chanting at that intersection.

9   Again, the music was too loud for Harman to speak there.  Observing this group, and the loud

10  noise, Harman was struck and troubled by the disparate treatment.  Like him, the Hare Krishnas

11  were out there and produced noise for religious purposes.  Like him, they preferred to use the

12  wide sidewalks located at the intersections with Cooper Street and Soquel Avenue.  But the

13  difference, it seemed, was no one complained about their noise, allowing them to be boisterous

14  and objectively loud, while Harman was forced to maintain a low volume due to anonymous

15  complaints.

16        52.    On Friday, July 24, 2015, Harman returned to Pacific Avenue sidewalks, and,

17  once again, lowered his amplification device as he spoke.  Notwithstanding, Lt. Barry

18  approached Harman on this day and abruptly revoked his amplification permit without warning.

19        53.    Lt. Barry told Harman he had received complaints about Harman's speech, and

20  because of these complaints, Harman's permit was "gone."  Lt. Barry emphasized the

21  consequences of the revocation: "You don't have an amplification permit anymore and I want

22  you to know that."

23        54.    Harman was taken aback by Lt. Barry's action.  Harman consistently lowered the

24

10

**COMPLAINT**

1    level of amplification as Lt. Barry had asked him to do.  Lt. Barry had never suggested to

2    Harman that he needed to lower the volume of the amplifier more or that he was at risk of losing

3    his permit.

4         55.    Harman asked how this could happen, pointing out the permit had not expired.

5    Lt. Barry did not provide any basis for the revocation.  He answered:  "It's over a year and I'm

6    taking it away from you."

7         56.    Harman was troubled by Lt. Barry's comment that he alone could decide to take

8    away the permit.  Harman asked Lt. Barry how he could arbitrarily take away an amplification

9    permit.  Lt. Barry responded:  "I'm in charge of amplification permits."

10        57.    Lt. Barry made Harman aware that he no longer had the covering of the

11   amplification permit for his expressive activity in the area.  "Just letting you know that you don't

12   have amplification permit anymore."

13        58.    Lt. Barry indicated to Harman that he could possibly re-apply for a permit but he

14   simultaneously advised Harman that he could not get one, surmising:  "You cannot use an

15   amplification device."

16   **Harman Shares Amplified Message Without a Permit**

17        59.    Having heard from Lt. Barry that he could not obtain another permit, Harman did

18   not seek one.  But he believed he should not need a permit to engage in his constitutionally-

19   protected speech anyway.

20        60.    Harman went back to the area on the following Friday, July 31, 2015.  When he

21   arrived he noticed the same six-member percussion group playing on Pacific Avenue sidewalk in

22   front of O'Neill Surf Shop, and their music was noticeably loud, far louder than his speech with

23   an amplification device.

24

**COMPLAINT**

61.     Subsequently, believing he did not need a permit to engage in his amplified expression, Harman shared his message with amplification on Pacific Avenue sidewalk.  No police officer took any action against Harman on this night.

62.     Harman returned to Pacific Avenue sidewalks on the next Friday, August 7, 2015. And, once more, he used amplification, Harman did not encounter any police that evening, but he did come across some aggressive hecklers, who tried to shout Harman down.

**Harman is Given Copy of Noise Ordinance**

63.     On the following Friday, August 14, 2015, Harman returned to Santa Cruz to share his religious views with passersby and he planned to use amplification to do so.

64.     At around 5:30 p.m., he arrived at the Pacific Avenue city sidewalk next to O'Neill Surf Shop, near the intersection with Cooper Street, and placed his stepstool down, along with a sign that reads:  "The Gift of God is Eternal Life Through Jesus.  Romans 6:23".  Harman chose this location because it is particularly well-travelled during weekend late afternoons and evenings and the sidewalk at this location is exceptionally wide.  The venue offers Harman an opportunity to reach many people with his beliefs.

65.     As he was setting up, Harman noticed in the same area three tables with people selling a variety of items, including board games, paintings, and other things.  Harman also observed a gentleman sitting on a nearby metalwork sculpture and tapping it like a bongo.

66.     Since pedestrians were passing by on the sidewalk, Harman began to share his message in a conversational tone, with his amplifier set to a low volume.

67.     Harman spoke for about twenty (20) minutes without interruption. However, a little after 6:00 p.m., Lt. Barry and Officer Burruel of the Santa Cruz Police Department came up to Harman.

**COMPLAINT**

1    68.    Though Harman was using his amplifier in plain sight of the police officers as

2  they approached him, they did not cite Harman for using amplification without a permit, nor did

3  they mention a need for a permit.

4    69.    Lt. Barry initiated the conversation.   Concerned about the purpose of the

5  interaction, Harman asked Lt. Barry if he had received any complaints about his speech, to

6  which, Lt. Barry replied: "Not yet."  Lt. Barry added that he had received some complaints about

7  Harman's speech in the past.

8    70.    Lt. Barry informed Harman that he wanted him to "watch the noise" or else he

9  would be in violation of a section of Santa Cruz's noise ordinance, § 9.36.020 Unreasonably

10  Disturbing Noises.  Lt. Barry brought an extra copy of this particular ordinance with him and

11  handed it to Harman, and offered to read the ordinance to Harman.

12    71.    With Lt. Barry's help, Harman read the law, requiring: "No person shall make,

13  suffer or permit to be made any noises or sounds which are unreasonably disturbing or physically

14  annoying to people of ordinary sensitiveness or which are so harsh or so prolonged or unnatural

15  or unusual in their use, time or place as to cause physical discomfort to any person."

16    72.    Harman was surprised by the presentation of this law to him.  He knew about the

17  permit requirement but no Santa Cruz police officer had mentioned the noise law to him in the

18  past.

19    73.    Lt. Barry did not tell Harman that he was being loud at that moment, but told

20  Harman his speech had been loud "in the past" and warned him to look out for his noise,

21  specifically, complaints about his noise.  Lt. Barry observed that employees of the adjacent

22  business, O'Neill's Surf Shop, had previously complained about Harman's "noise" in the past,

23  and asked Harman to be a "good neighbor."

24

13

**COMPLAINT**

74.     Harman wanted to be good neighbor.  He had no intention of being loud and no objection to keeping his volume at a reasonably low level.  However, Harman found the noise ordinance vague and he could not perceive from it what noise was criminalized.  Harman was concerned about how he could objectively determine if he was violating the law or how a police officer could objectively determine if he was violating the law.

75.     Harman asked if there was some way to measure his volume level to ensure that he was in compliance with the ordinance.  But, Lt. Barry interjected, "for this municipal code, we don't have to measure it."  Lt. Barry confirmed to Harman that the standard for the noise law is subjective.

76.     Harman was unsure and uneasy about the subjectivity of the noise law.  He reminded Lt. Barry that he had kept his amplification device at a low volume just as the officer had requested.  Lt. Barry agreed with Harman that he had done this, commenting that he appreciated him doing that, but reiterated to Harman that he would have to comply with the noise law.

77.     Harman pointed out to Lt. Barry that a band was allowed to play loud music the week before on that same sidewalk and the music was blaring, directly facing the doors of O'Neill's, and they were much louder than Harman.  Lt. Barry replied that the band likely had a permit (unlike Harman) and reminded Harman that O'Neill's had complained about Harman's expression, not the band's, indicating that complaints, and not necessarily noise level, dictate whether a violation occurs.

78.     Harman assured Lt. Barry he was willing to turn down the volume should the volume be a concern.  Lt. Barry acknowledged Harman's willingness to keep his volume down, but warned Harman that he could be criminally cited if someone complains about his speech.

**COMPLAINT**

79.     Harman expressed his belief that he has a constitutional right to use amplification at a reasonably and objectively low level, but Lt. Barry advised Harman that if he violated the noise law, they would have to "hash it out" in court.

80.     Harman agreed to keep the volume at a reasonable low level, and Lt. Barry left.

**Harman is Criminally Cited for Speaking on Pacific Avenue Sidewalk with Amplification**

81.     Harman then resumed speaking with his amplifier and he was able to do so for over one hour, with no problems.

82.     But, shortly after 7:00 p.m., a jazz ensemble showed up on the same sidewalk as Harman, facing O'Neill's, comprising of musicians playing saxophone, trumpet, drum, guitar, and amplified keyboard, busking for tips.   The ensemble was noticeably loud, exhibiting no concern for violating the noise law.

83.     The loud volume of the music effectively drowned out Harman's speech, such that he could not speak and be heard by passersby.

84.     Harman did not believe he could compete with the band's significant noise level, and recalling Lt. Barry's warning, he did not want to try to speak over them and risk a citation.

85.     Harman therefore moved down the street to the sidewalk at the southeast corner of the intersection of Pacific Avenue and Soquel Avenue.   Like his previous location, this sidewalk was particularly wide and well-travelled, offering him another excellent opportunity to reach passersby with his religious message.   Harman set up his stepstool and placed down a sign reading:  "Evolution is a Lie.  In the Beginning God Created…. Genesis 1:1."

86.     He then stood on his stepstool and resumed speaking with amplification at a reasonable low volume just as he had done before.   Harman shared his message for approximately twenty (20) minutes without incident.   The message he delivered was typical of

**COMPLAINT**

his preaching.  In a conversational tone, he expressed an orthodox Christian salvation message, stating that we can all have forgiveness of sins though faith in Jesus Christ.

87.     Shortly after 7:30 p.m., a gentleman wearing a tie-dye shirt, along with a dog on a leash, arrived and put down a case of seashells and rocks right next to Harman and began to heckle Harman as he spoke.  The heckler ("seashell heckler") made snide comments about Harman and his message, but despite the distraction, Harman continued with his message as normal.

88.     About fifteen (15) minutes later, a gentleman man carrying a bongo, identified as James Smyth ("Smyth"), arrived on the scene, and placed his bongo directly in front of Harman. He then set an unidentified object on fire and waved it in front of Harman's face, and circled around him.

89.     At this point, several people stopped and lingered to see what was going on. Noting the audience, Harman tried to resume his preaching, but Smyth grabbed his bongo, put it between his legs, and started playing it in an effort to block out Harman's message.

90.     Seeing how Harman was being treated by the hecklers, an older gentleman whom Harman did not know approached and rebuked the hecklers.  Smyth said he would stop and leave out of respect for the older gentleman, but as he was leaving, he expressed his disdain for Harman's message, saying "I will not tolerate hate speech."  The seashell heckler yelled at the older gentleman about his right to be there.

91.     Just then, an individual riding a motor scooter down Pacific Avenue (motor scooter heckler) stopped, and seeing Harman speaking, honked his horn loudly numerous times before riding off.  In response, the seashell heckler howled at the top of his lungs several times. The seashell heckler then packed up and left.

**COMPLAINT**

92.     Thereafter, for about ten (10) minutes, Harman was able to preach without interruption, and those who had been lingering slowly dispersed.  At that point, a gentleman wearing a red hat ("red hat heckler") approached Harman, and expressed loud disagreement with the message, yelling at Harman, telling him that he needed to leave.  Harman tried to reason with the man at a moderate volume, explaining his freedom to speak, but the man persisted in yelling and cursing loudly at Harman.

93.     At this time, a motorcyclist (motorcycle heckler) stopped along the curb at the corner of Pacific and Soquel and began loudly revving his engine to drown out Harman's speech. When Harman turned around to see what was going on, the motorcycle heckler made an obscene hand gesture at him, continued revving his engine, and then mocked Harman, holding his hand to his ear and asking "What'd you say?" while continuing to rev the engine loudly.  When the revving stopped, Harman tried to begin again, but the red hat heckler started screaming in Harman's face, "We don't care! We don't care!" as loud as he could.  Around this time, Officer Burruel arrived, and noticed that the hecklers were being louder than Harman and drowning him out.

94.     Looking around for help with the motorcycle heckler and the red hat heckler, who both were becoming increasingly louder, Harman spotted Officer Burruel across Pacific Avenue speaking with a man identified as Jim Hammana.  As was his custom, Hammana had been standing outside his business, and had seen and heard Harman and the hecklers.  Harman hoped the officer would notice how loud the motorcycle heckler and the man were being, and asked Officer Burruel, through his amplifier, whether he was okay with their actions.  Officer Burruel did not respond.  The red hat heckler interjected and said, "Yes, he's fine with it!  Look at him, he's standing over there, he doesn't want to hear your s*** either.  What you're preaching is

17

**COMPLAINT**

1   bull****, dude."

2      95.    The motorcycle heckler then addressed the crowd and said that if they could pay

3   him money for gas, he would continue revving his engine "all night, as long as he's [Harman]

4   here," and he revved his engine loudly again to demonstrate.

5      96.    As this was going on, Smyth returned, along with his bongo.  He positioned

6   himself right next to Harman and began playing his bongo loudly again.  A little later, Smyth

7   stood up and began waving the unidentified burning object within inches of Harman's face

8   again.

9      97.    Harman resumed preaching, but the motorcycle heckler, who was still there,

10  revved up his engine every time Harman spoke.  Unable and unwilling to speak louder the

11  motorcycle heckler's revving, Harman paused between phrases, hoping to share his message

12  piece by piece between engine revs.

13     98.    After several minutes of this, the motorcycle heckler left, and Harman began

14  preaching normally again.  In direct response, Smyth resumed playing his bongo loudly again to

15  drown out Harman's preaching.

16     99.    Eventually, Smyth ceased drumming and Harman was able to preach

17  uninterrupted for about 10 minutes or so.

18     100.   However, at around 8:20 p.m., the seashell heckler returned, seized Harman's

19  sign, threw it across the sidewalk toward O'Neill's, and loudly cursed at Harman, before sitting

20  down in front of him, to his left, to play a percussion instrument.  Harman asked the seashell

21  heckler to watch his language with ladies present, but he responded by screaming: "Get the f***

22  out of here, you faggot!"  Smyth then resumed playing his bongo loudly on Harman's right.

23     101.   Between the two loud hecklers, they were able to drown out Harman's message.

24

**COMPLAINT**

Harman tried to preach in the midst of the noise but he could not be heard.

102.    At or about this time, a pedestrian, Holly Garver (Garver) flagged down Officer Burruel to complain about Harman.  She told Officer Burruel that Harman was becoming "confrontational" with people at the intersection of Pacific Avenue and Soquel Avenue.  She pointed to Harman, and described Harman's behavior as disturbing. Officer Burruel asked Garver if she would sign a citation for unreasonable noise and she agreed.

103.    Officer Burruel called in Sgt. Jones, advising that Garver had signed a citation for unreasonable noise against Harman and was willing to press charges.

104.    Officer Burruel proceeded to investigate Harman for the violation of the unreasonable noise ordinance. He fielded other complaints about Harman's demeanor and manner.  He also went to his parked squad car and grabbed a video camera.

105.    Upon retrieving his camera, Officer Burruel briefly videotaped Harman and the hecklers from his vehicle, which was parked approximately 75 feet away and behind them. From that spot, Harman's speech was not discernible.  However, the seashell heckler could be heard shouting at Harman, screaming "No one wants you!", "Go Home!", and "Mother-f***ing c***-sucker!"  The bongos were also clearly audible.

106.    Then, Officer Burruel walked back around on the other side of Pacific Avenue and walked toward Harman, placing the video camera on Harman as he walked.

107.    At this time, around 8:30 p.m., Harman noticed Officer Burruel walking toward him from across Soquel Avenue while videotaping him.  Officer Burruel seemed preoccupied with the videotaping, which was squarely directed at Harman.  The police officer took no action to stop any of the loud noises the hecklers were producing because no one complained about them.

**COMPLAINT**

108.   Harman asked Officer Burruel why he refused to take action when the hecklers were suppressing his religious speech and taking his belongings.  Officer Burruel stopped and stood about 10 to 15 feet away from Harman.  While Harman was addressing the police officer, at that very moment, the seashell heckler got up, faced Harman, screamed and cursed at him about expressing his own religious speech, forcibly took Harman's sign out of his hand and threw the sign into the street and nearly hit Santa Cruz Councilwoman Richelle Noroyan (who was standing nearby) with it, and continued with his loud cursing, while pointing his finger in Harman's face.  Officer Burruel saw all of this, capturing it on video.

109.   In lieu of coming to Harman's aid, or addressing the seashell heckler about his actions, Officer Burruel asked Harman: "Do you want to talk to me?" He waived at Harman, indicating to Harman that he needed to come to him if he wanted to speak with him.  Harman got down from his stepstool, walked toward the police officer, and asked if he was okay with the seashell heckler's antics.  Hearing this, Officer Burruel just repeated:  "Do you want to talk to me?

110.   Then, another heckler, a bearded gentleman ("bearded heckler") came right up to Harman and started yelling at him in his face, accused Harman of molesting children, all while Harman was trying to have a conversation with Officer Burruel.  The seashell heckler continued to shout at Harman.  Smyth was also yelling at Harman behind him, repeating that he does not tolerate hate speech.  But the police officer was oblivious to everything that was going on around them.  He was focused entirely on videotaping Harman.

111.   Harman pointed out to Officer Burruel what was happening and that the officer was not doing anything about it.  The police officer asked curiously whether he wanted him to do something.  The police officer did not indicate to Harman any concern about his volume level.

**COMPLAINT**

112.    Realizing that the hecklers and some others were surrounding him, Harman returned back to his stool.  As he was walking toward his stepstool, Santa Cruz Councilwoman Richelle Noroyan asked Harman whether he had a permit and he replied that he did not need a permit.

113.    Smyth started to walk around Harman, repeatedly shouting statements at him like "Santa Cruz does not tolerate your hate speech," and "Santa Cruz does not tolerate you,"  "We do not want you here."  As this was happening, Officer Burruel continued his videotaping and took no action to alleviate the escalating situation.

114.    Before Harman could get back on his stepstool, Hammana addressed him, and identified himself as a Christian who did not agree with Harman's message.  After brief discussion, Harman went back on his stepstool to preach.  Hammana was agitated and told Harman to step down from his stool and speak with him.  But believing further conversation with Hammana would not be fruitful, Harman declined, remained on his stool, and began to preach again.  With Harman preaching, the seashell heckler began to play his percussion instrument again, directly in front of him.

115.    Sgt. Jones of the Santa Cruz Police Department arrived on the scene.  His initial purpose was to advise Harman of Municipal Code, 9.36.020, but he did not do so.  Though Sgt. Jones was investigating Harman for possibly violating the noise ordinance, he did not address Harman to warn him, obtain his statement, or ask him to lower his volume.

116.    In lieu of speaking with Harman, Sgt. Jones spoke with Officer Burruel and Amber Driscal, the closing manager of New Leaf Community Market, a nearby business to elicit their opinions about Harman's speech.

117.    As Sgt. Jones was culling information about Harman, the bearded heckler

21

**COMPLAINT**

persisted in yelling at Harman, hurling various insults at him.  The police officers did not

intervene.  To the extent he could, Harman ignored the bearded heckler and continued with his

preaching.

118.    While Harman preached, the bearded heckler continued to interject and the

seashell heckler continued to play his instrument. A couple of minutes later, in an effort to drown

our Harman's message, the bearded heckler grabbed the bongo and started playing it, but Smyth

quickly came back, recaptured his bongo, and resumed playing it loudly directly in front of

Harman, sometimes lifting up his bongo to Harman's face, to keep others from hearing his

message.

119.    Smyth did so continuously for several minutes in the presence of the police

officers.  The seashell heckler joined in and loudly shouted "No one wants you!"  Harman tried

to speak but his speech was nullified by the surrounding noise. All the while, the police took no

action to quiet down the loud hecklers because no one complained.  Sgt. Jones noticed the

hecklers running up to Harman and he identified Smyth as the one loudly playing a bongo for the

purpose of distracting Harman, but Sgt. Jones took no action regarding these matters.  Instead, he

continued to take down information for bringing a citation against Harman.  And Officer Burruel

continued to videotape Harman.

120.    A few minutes later, the police officers moved closer toward Harman.  Believing

something was about to happen, Harman turned off his amplifier, ceased his preaching, and

waited to see what the officers would do.  The bearded heckler, however, was non-relenting in

his yelling at Harman, as was Smyth with his bongos.

121.    Sgt. Jones took Hammana's statement.  Hammana signed a citizen citation against

Harman for loud unreasonable noise.  Hammana did not sign a citation against any of the

**COMPLAINT**

hecklers despite producing sound louder than Harman.

122.    Hammana turned toward Harman and again instructed him to step down from his stool, but Harman declined, explaining he was there to preach.  Hammana then warned him: "This is the last day you will do this."

123.    The seashell heckler then screamed at the top of his lungs at Officer Burruel, imploring him to give Harman a ticket, comparing the situation to a music friend of his who received tickets, but the officer did not respond.  The bearded heckler launched into a loud tirade at Harman about the content of his speech, specifically targeting Harman's preaching about hell, stating, "You talk to businessmen here like that? Boy, this guy should give you a ticket!" "You're a coward!" Another person shouted "Burn him at the stake!"  And Smyth kept playing his bongos.

124.    As this was occurring, Sgt. Jones was speaking with Garver.  Sgt. Jones inquired of her whether Harman's volume was the issue, but Garver corrected, "Right, but there's another issue.  He used, um, homophobic language, he also – which is hate speech."  Sgt. Jones indicated that he understood but added that the thing that allows them to silence Harman that night, the bigger issue, was to enforce the noise ordinance because Harman needs a permit to use amplification.  Garver confirmed Sgt. Jones's understanding that Harman did not have a permit and thanked the officer for the clarification.  Garver advised that she could hear Harman within a block and indicated that she had already signed a "citizen's citation" against Harman.

125.    Smyth then took a break from drumming and announced to the crowd that he would not tolerate Harman's "hate speech" and vowed to loudly play his bongos to "block him out" every Friday night, and invited others to join him in this effort.

126.    At this time, Noroyan spoke with the police officers about the situation.  She

**COMPLAINT**

1   inquired whether Harman was subject to arrest and Officer Burruel indicated that if Harman was

2   asked to move and refused, he could be arrested.   Noroyan pointed out to both Sgt. Jones and

3   Officer Burruel the seashell heckler (whom she referred to and identified as the "angry man")

4   picked up Harman's sign and threw it at her head.   To which, Officer Burruel responded, "yea,

5   yea."   Neither police officer seemed interested as they were about to issue a criminal citation to

6   Harman.

7       127.   Up until this point, no one had asked Harman to lower his volume.   Lt. Barry was

8   the only individual who had even mentioned volume to Harman.

9       128.   Sgt. Jones then approached Harman and asked for his identification.   Harman did

10   not have his ID on him, but he believed he had a photograph of his ID on his phone, and

11   attempted to find it for Sgt. Jones.   As he was trying to track down a photograph of his ID,

12   Harman inquired of Sgt. Jones what law he was breaking.   Sgt. Jones replied, "Two citizens have

13   signed citizen's citations against you for your loud amplification."   Knowing he had not become

14   unreasonably loud, Harman asked if anyone had measured the volume of his speech.   Sgt. Jones

15   admitted that no one had measured Harman's volume, remarking that he could hear Harman

16   from "down the street."

17       129.   As this was happening, Smyth and others continued to talk loudly in the area

18   without any fear of reprisal.

19       130.   Harman asked Sgt. Jones to confirm he had not asked Harman to lower his

20   volume at any point that night, and Sgt. Jones admitted that he had not, but incorrectly claimed

21   that others had asked Harman to lower his volume and said he asked him to do so in the past.

22   Sgt. Jones again asked for Harman's identification, but Harman wanted to know what law he was

23   breaking, so he asked.   Sgt. Jones curtly replied that Harman was breaking the municipal code,

24

1   and insisted on seeing Harman's ID.  Harman sought clarification of which particular ordinance

2   he was breaking, but Sgt. Jones warned Harman that he was beginning to obstruct his

3   investigation, so Harman began searching his phone again for a photograph of his ID.

4       131.    Harman handed Sgt. Jones his phone and Sgt. Jones began writing up a criminal

5   citation.  As this was occurring, a passerby walked up and commented that he thought it was

6   ridiculous that Harman was getting a ticket, while no action was taken against the multiple

7   hecklers who were yelling and cursing at Harman as he was trying to speak.

8       132.    When Sgt. Jones addressed Harman again, Harman asked which ordinance he was

9   violating and how it applied to his speech.  Sgt. Jones replied: "So, first of all, this is a citizen's

10  citation.  There are two separate citizens that came to us and were complaining about your loud

11  amplified music – excuse me – your speech.  So they came and said that due to the level of the

12  noise, they were offended.   So they signed these two citations against you.   I am just

13  administering that on their behalf."

14      133.    Harman requested the number of the ordinance he was supposedly breaking, and

15  Sgt. Jones reiterated that it was a citizen's citation for Harman's amplified sound.   Harman

16  clarified that he was seeking the ordinance number, and Sgt. Jones explained that Harman was

17  being cited for loud amplified noise under Santa Cruz Municipal Code Section 9.36.020 and then

18  returned to filling out Harman's citation.

19      134.    Harman queried Sgt. Jones about his freedom of speech.  Sgt. Jones responded to

20  Harman that he has freedom of speech but said his use of an amplifier was against the municipal

21  code.  Harman wanted clarification and asked if he was violating a municipal code by using an

22  amplifier.  Sgt. Jones replied:  "I'm not going to get into a debate with you.  I explained it very

23  clearly."

24

135.     Shortly thereafter, Hammana, insistent on discussing Harman's message with him, asked Harman again to speak with him.  Harman, though, did not find the timing good as he was dealing with the police.   Harman offered to speak with Hammana later.   In response, Hammana harried, "You don't want to talk to me right now?  We're on the same level.  You used to be on a pedestal, now you're not.  Can you talk to me for a second?  Or are you not ready to answer my questions?  Or do you just want to preach to me?  I don't want to hear you preaching, I want you to talk to me.  Can you talk?  Or no?  Don't ignore me.  Just because you don't have your microphone on.  Nobody can hear you now.  Talk to me.  Or is that too much for you?  One on one.  Did God put you on that pedestal?  You don't want to answer that question?  Or maybe I should put that pedestal under you so you can talk to me?  I didn't get an answer, yet. Hello?  No response, no answer?  Did God tell you to ignore me?"

136.     Turning his attention back to Sgt. Jones, Harman asked him to confirm that he was cited solely because others had complained about his speech, and Sgt. Jones replied: "That is correct."   Harman explained to Sgt. Jones that Lt. Barry had already told him his volume of speech was acceptable, but Sgt. Jones confirmed he was enforcing the wishes of citizens.

137.     Harman raised his free speech concerns.  But Sgt. Jones told Harman the citation has nothing to do with freedom of speech.  He reminded Harman that they had given him a permit, which had previously protected his freedom of speech; however, he added that Harman has to now comply with the municipal code and two people "have an opinion" that Harman was violating the ordinance.  Sgt. Jones concluded:  "So, we're facilitating that citation on the behalf of those two people.  It's that simple."

138.     Sgt. Jones went on, claiming: "So if you turn around where my patrol car was parked, that's a good 75 feet away.  When I parked there with my engine running and got out of

**COMPLAINT**

1   my car, the loudest thing that was going on here was your speaker.  And you yelling on that

2   speaker over other people that were talking.  And I could hear that far and beyond.  I'm not

3   citing you.  But it gives a little bit of credence and credibility to the two people that do want you

4   cited."

5       139.   Harman knew this characterization was incorrect, as he had recorded himself

6   speaking at a reasonable low volume, while it was the hecklers who were much louder.  He was

7   concerned that Sgt. Jones taking the complainants at their word instead of objectively measuring

8   his volume.  Harman was also struck by the subjectivity of it all.  Hecklers and musicians were

9   making noises that were objectively much louder than him in the same area at the same time, and

10   yet, none of it mattered, as he was the one who received the criminal citation because citizens

11   complained about his "noise" and not that of others.

12       140.   Sgt. Jones wrapped up some police paperwork and proceeded to issue Harman the

13   two citations, one regarding a complaint from Garver and the other one from Hammana, and

14   explained the process.  Then, Sgt. Jones advised Harman, "So, I wanna be really honest with

15   you.  There's – seems to be some really agitated people, and I do fear for your safety a little

16   bit…So it might be a good idea to move down the mall or wrap it up for tonight."

17       141.   Harman informed that he began that evening near Cooper Street, but he could not

18   compete with the sound of the jazz ensemble.  In response, Sgt. Jones indicated they had the

19   same freedom of speech as Harman, remarking:  "So, if someone decides to come and play right

20   next to you, and it's acoustic, drown you out, not much we can do about it."  Harman noted the

21   obvious irony that buskers and others could be loud enough to drown him out, but he could not

22   speak so as to be heard.  But Sgt. Jones surmised: "That's why we have judges, because it's all

23   up to interpretation.  That's what law is."

24

**COMPLAINT**

142.   Following some more discussion, Harman indicated that he would try to move down the block and speak again.  By this time, it was about 9:00 p.m., and the crowd had died down, so Harman decided to return to the sidewalk near the intersection of Pacific and Cooper, hoping the ensemble had finished playing.  But, before departing, Sgt. Jones left Harman with an ominous warning: "And I would – I would say if someone complains again we're just gonna be out here again doing the same thing."

143.   Harman was troubled by the citation and this warning, underscoring the arbitrary nature of the noise ordinance.  He knew the jazz ensemble was much louder than him, but he was stopped and they were not because someone complained about him.  He knew the seashell heckler, Smyth (with the bongos), the person on the motor scooter, the red hat heckler, the motorcycle heckler, and the bearded heckler, were all louder than him, and their noise was created solely to drown out his message, but he was the one given a criminal citation for unreasonable noise.  Since the police were tying violation of the law to subjective complaints, Harman knew he could easily get another citation.

144.   After concluding his conversation with Sgt. Jones, Harman returned to the sidewalk near Pacific and Cooper, and noticed the same jazz ensemble was still playing loudly, and now included a woman singing into an amplification device.  As before, Harman knew he could not compete with the volume of the band, so he waited for them to finish.  The jazz ensemble continued to play in this manner until about 9:45 p.m.

145.   After the jazz ensemble left, Harman preached with his amplifier for another fifteen minutes until about 10:00 p.m., at which time, he gathered up his stuff and left.

146.   Although Harman was cited for his oral preaching, none of the ones who heckled Harman were cited, despite their consistently loud screaming, yelling, drumming, and revving of

**COMPLAINT**

engines.  Nor was the jazz ensemble outside of O'Neill's cited for its loud amplified music, which persisted for approximately two and a half hours.

**Harman is Criminally Cited for Speaking on Pacific Avenue without Amplification**

147.    Fearing further citation and possible arrest, Harman has not resumed his amplified preaching in Santa Cruz since the evening of August 14, 2015.

148.    In the weeks following his citation, Harman tried to preach on Pacific Avenue in downtown Santa Cruz with just his natural voice.  Harman figured he could preach as long as he did not use amplification, but the lack of amplification hampered his ability to deliver his message.

149.    Harman could not be heard as well without amplification.  Also, to be heard at all, Harman was forced to lift up his voice, which kept him from speaking in a conversational tone.  When passersby were able to hear his message, many appeared off-put by their perception that Harman was "yelling" at them, and some specifically informed him of such.  This result adversely affected the message he wanted to convey.

150.    Harman went back and preached without incident on August 28, 2015 and September 11, 2015.

151.    On these occasions, hecklers showed up and engaged in boisterous activities, including playing instruments at loud volume and screaming in Harman's face, with the intention of drowning out Harman's speech, and they were largely successful in doing so.

152.    On September 18, 2015, Harman returned to the sidewalk at the corner of Pacific and Cooper and preached at a reasonable volume with his natural voice from about 5:15 p.m. to 7:15 p.m.

153.    At about that time, the jazz ensemble returned and began playing too loudly for

**COMPLAINT**

1   Harman to possibly be heard at that intersection.  Harman therefore relocated to the sidewalk at

2   the corner of Pacific and Soquel and resumed his preaching there.  He spoke using a reasonable

3   tone, though he was lifting his voice, and was louder than he would be in ordinary conversation.

4        154.    But, around 7:30 p.m., Officer Burnham of the Santa Cruz Police approached

5   Harman and informed that he was in violation of Municipal Code 9.36.020.  Neither Officer

6   Burnham nor any other police office gave Harman a warning about his noise level before giving

7   him a citation.

8        155.    Harman pointed out that he was not using amplification, but Officer Burnham was

9   not moved, explaining the ordinance prohibited any "unreasonable noise," regardless of

10  amplification use.

11       156.    Officer Burnham did not indicate any objective criteria he used to judge Harman's

12  noise level, but relied on the subjective complaints of others.  Harman asked the police officer

13  how the sound was measured, if he or the complaining citizen measured his voice level, but the

14  officer did not answer the question.

15       157.    Officer Burnham advised Harman that the citation was not an admission of guilt,

16  but if he refused to sign the citation, he would be arrested and taken to jail.

17       158.    After receiving this citation, Harman continued to preach that night, but with no

18  objective guidance as to what volume was permissible, causing Harman to be unsure on how

19  loud he could be.  Finding the effort futile, Harman subsequently left.

20       159.    Because of his susceptibility to criminal sanction for speech with or without

21  amplification, his inability to discern an acceptable sound level under the law, and the

22  discriminatory way in which the ordinance was being applied to his religious expression,

23  Harman determined that he was not free to preach in downtown Santa Cruz without risking

24

**COMPLAINT**

citation and arrest.  As of that date, Harman had obtained three citations, issued over the course of two visits to Santa Cruz, that totaled $1455 in criminal fines, and he did not want to risk any more or criminal arrest.

160.    For fear of further citation and possible arrest, Harman has not preached in Santa Cruz since September 18, 2015.

**Continuing Ban on Harman's Speech on Pacific Avenue Sidewalks**

161.    Hoping to resolve this conflict without litigation, on October 14, 2015, Harman sent a letter, through counsel, to Mayor Don Lane, Santa Cruz City Manager Martín Bernal, Santa Cruz City Attorney Anthony Condotti, and Police Chief Vogel, describing Harman's constitutional concerns in detail.

162.    This letter set out Harman's interactions with Santa Cruz police on August 14 and September 18 of 2015, and the citations received, specifically pointing out the various other loud individuals who were not cited or otherwise stopped.  Harman specifically described the discriminatory application of the law that targeted his – and only his – expression due solely to the subjective complaints of others.  The letter requested Santa Cruz drop the charges against Harman and provide written assurance that the City would no longer apply Santa Cruz Municipal Ordinance 9.36.020 in an unconstitutional manner against Harman's speech.

163.    On November 4, 2015, City Attorney for Santa Cruz responded to Harman's letter, but declined to offer any relief that could alleviate Harman's constitutional concerns.  On behalf of the City, the author asserted that the ordinance and its application to Harman were constitutional.

164.    The City agreed to dismiss the September 18 citation, but only because evidence was lacking.  The City staunchly defended the process of letting citizens decide whether a given

**COMPLAINT**

noise was too loud.  Taken together with the City's support of the ordinance's application to Harman on August 14, the stance reinforced the subjective and discriminatory enforcement of the ordinance.  Santa Cruz refused to provide Harman assurance that his preaching in Santa Cruz, with or without amplification, will not be suppressed on the basis of subjective complaints.

165.    On its face, Santa Cruz Municipal Ordinance 9.36.020 restricts speech without identifying any objective quantum of volume prohibited or objective criteria by which a violation is determined.

166.    In addition, Santa Cruz Municipal Ordinance 9.36.040 specifically holds that "The provisions of this chapter are enforceable without reference to the regulations concerning noise set forth in the Zoning Ordinance and the fact that the city officer issuing a citation has not obtained a scientific noise measurement prior to issuing the citation shall not constitute a defense," encouraging subjective enforcement.

167.    This subjective standard of both ordinances empower police officers to make arbitrary and discriminatory enforcement decisions.

168.    By enforcing this ordinance through "citizen's citations," Santa Cruz empowers private citizens to discriminatorily target for censorship purposes any speech with which they disagree, while allowing other speech to persist though just as loud or louder.  Santa Cruz uncritically enforces these complaints with no way to objectively determine that a violation has occurred, effecting a heckler's veto in the process.

169.    The practical effect of the application of these two ordinances, and the accompanying policy, is that Santa Cruz has effectively banned Harman from expressing his religious views in public, with or without amplification and regardless of volume, because any citizen may claim that Harman is being "unreasonably loud" just because he/she hears an

**COMPLAINT**

objectionable message and police will enforce it via criminal citation.  Left to the whim of a hostile audience, Harman has no way of discerning what objective volume he may safely speak.  As long as it is loud enough for someone to object to the message, he is subject to violation.

170.   Harman is especially vulnerable to this arbitrary enforcement without the covering of a noise permit.  Santa Cruz Municipal Ordinance 9.40.010 provides "No person shall use or cause to be used at any place in the city whether on public property or private property any sound-amplifying device or equipment without first having secured a permit to do so from the police department, except as provided in Section 9.40.060."  This imposes a prior restraint on a constitutionally-protected medium of expression.

171.   The exceptions to this requirement, set out in Santa Cruz Municipal Ordinance 9.40.060, are so narrow that most protected forms of amplified speech remain subject to the permit requirement: "The permits otherwise required by this chapter shall not be required of sound-amplifying equipment or devices under the following circumstances: (a) Sound-amplification equipment or devices used on privately owned property, whether indoors or outdoors, where the sound produced does not carry beyond the property line or does not unreasonably disturb any person outside the property where the sound is generated; (b) Sound-amplification equipment or devices used in conformity with an entertainment permit issued by the police department; (c) Sound-amplification equipment or devices used in conformity with a use permit under the provisions of Title 24 of this code; (d) Radios, record players, TV's, and tape players wherever used, when the volume does not exceed the volume or normal conversational speech; (e) Sound-amplification equipment or devices used on emergency vehicles or by government employees in connection with any activity undertaken for the protection of the public welfare or safety; (f) When a permit has been issued by the parks and

**COMPLAINT**

1    recreation department for sound amplification in a city park."

2        172.    After imposing this broad restriction, Santa Cruz Municipal Ordinance 9.40.030

3    holds "The police chief may grant the sound amplification permit if he determines that the sound

4    amplification will be conducted in such a manner as not to unreasonably disturb the neighbors or

5    other persons in the vicinity of the sound amplification, and if he further determines that if

6    actually implemented, the steps to be taken by the applicant to minimize or avoid such

7    disturbance will be adequate. In granting a permit, the police chief may impose such conditions

8    as may be appropriate or necessary in order to protect the public peace and safety."  Because the

9    police chief is not bound to issue a permit even if the provided criteria are satisfied, it effectively

10   vests him/her or his/her designee with unbridled discretion to grant permits.

11       173.    Even if a permit is granted, the police have the unbridled discretion to revoke the

12   permit under Santa Cruz Municipal Ordinance 9.40.040, which provides: "Any permit granted

13   pursuant to this section shall be revocable at any time by the police chief for good cause."  The

14   ordinance provides no further elaboration on "good cause," allowing the permit to be revoked for

15   any reason at all.

16       174.    As enforced by Santa Cruz police, an amplification permit operates to immunize

17   the permittee from violating 9.36.020 regardless of their volume.  A coupling these two

18   ordinances allow the Santa Cruz Police to arbitrarily and discriminatorily decide who is exempt

19   from 9.36.020 on the one hand, and who is subject to the whims of a critical audience on the

20   other.

21       175.    The ongoing fear of criminal sanction and prosecution severely limits Harman's

22   constitutionally-protected expression on a public sidewalks in downtown Santa Cruz.

23       176.    The impact of chilling and deterring Harman from exercising his constitutional

24

**COMPLAINT**

1    rights on public sidewalks constitutes irreparable harm to Harman.

2        177.    Harman has no adequate remedy at law for the loss of his constitutional rights.

## VI.    FIRST CAUSE OF ACTION

### Violation of Free Speech Clause

### United States Constitution

6        178.    Harman re-alleges and incorporates herein by reference all preceding paragraphs.

7        179.    Harman's religious speech is protected speech under the First Amendment.

8        180.    Harman challenges Santa Cruz Municipal Ordinance 9.36.020 both on its face and as applied to his religious expression.  He further challenges Santa Cruz Municipal Ordinance 9.40.010 et seq. both on its face and as applied to Harman's religious expression.

11       181.    These two ordinances, individually and jointly, and their individual and joint enforcement against Harman's speech activities:

    a.    are vague and overbroad;

    b.    discriminate against speech because of speaker's content;

    c.    discriminate against speech because of speaker's viewpoint;

    d.    restrain constitutionally-protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the policy;

    e.    chill the free speech and free exercise of religion of Harman and of other third party citizens;

    f.    allow for the exercise of unbridled discretion;

    g.    constitute a content-based and viewpoint-based heckler's veto that silences Harman's expression due to the reaction of hostile audiences;

35

**COMPLAINT**

1    h.    lack narrow tailoring, fail to achieve any legitimate government purpose, and fail

2          to leave open alternative avenues for expression; and

3    i.    are unreasonable.

4    182.    Defendants have no compelling or legitimate reason that can justify the

5    censorship of Harman's religious speech on city sidewalks through the application and

6    enforcement of either ordinance.

7    183.    The ordinances and Defendants' policies and practices enforcing them, violate the

8    Free Speech Clause of the First Amendment to the United States Constitution, made applicable

9    to the states through the Fourteenth Amendment.

10    WHEREFORE, Harman respectfully prays the Court grant the equitable and legal relief

11    set forth in the prayer for relief.

12    **VII.    SECOND CAUSE OF ACTION**

13    **Violation of the Due Process Clause**

14    **United States Constitution**

15    184.    Harman re-alleges and incorporates herein by reference all preceding paragraphs.

16    185.    Ordinance 9.36.020 is too vague to give persons of reasonable intelligence fair

17    notice of the quantum of volume which is prohibited.

18    186.    Ordinance 9.36.020 lacks sufficient objective criteria to guide law enforcement

19    officers and prevent arbitrary and discriminatory enforcement.

20    187.    Defendants' policies and practices of uncritically enforcing, via citizens' citations,

21    Ordinance 9.36.020 based on private complaints fails to give persons of reasonable intelligence

22    fair notice of what precise conduct is prohibited.

23    188.    Ordinance 9.40.010 *et. seq.* lacks sufficient objective criteria to guide law

24

36

**COMPLAINT**

enforcement officers and prevent arbitrary and discriminatory enforcement, vesting them with unbridled discretion to grant, deny, or revoke permits for any reason or no reason.

189.   Defendants have no compelling or legitimate reason that can justify their vague ordinances or their policies enforcing them.

190.   The ordinances and Defendants' enforcement thereof violate the Due Process Class of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Harman respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

## VIII.   THIRD CAUSE OF ACTION

### Violation of the Equal Protection Clause

### United States Constitution

191.   Harman re-alleges and incorporates herein by reference all preceding paragraphs.

192.   Under Ordinance 9.36.020 and/or Ordinance 9.40.010 and Defendants' policies enforcing it, Defendants have allowed and continue to allow expressive and non-expressive activities substantially louder than Harman's to take place on the public sidewalks while effectively prohibiting Harman from expressing his religious beliefs at a reasonable volume in the same locations.

193.   Defendants' enforcement of Ordinance 9.36.020 through citizens' citations effectively discriminates between Harman and other similarly-situated speakers and non-speakers based on the content and viewpoint of his expression.  While others may produce objectively loud sound with impunity, only those, like Harman, of whom private parties selectively complain are subject to punishment by Defendants.

194.   Defendants have no compelling or legitimate reason that would justify their

37

**COMPLAINT**

disparate treatment.

195.    Ordinance 9.36.020, Ordinance 9.40.010 and Defendants' enforcement thereof violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Harman respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

## IX.    FOURTH CAUSE OF ACTION

### Violation of the Liberty of Speech Clause

### California State Constitution

196.    Harman re-alleges and incorporates herein by reference all preceding paragraphs.

197.    The Liberty of Speech Clause of the California State Constitution, set out in Article 1, § 2(a), reads:  "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right.  A law may not restrain or abridge liberty of speech or press."

198.    The Liberty of Speech Clause in California State Constitution provides more expansive protection than the First Amendment to the United States Constitution.

199.    Harman's speech is protected speech under the Liberty of Speech Clause of the California State Constitution.

200.    The areas where Harman wants to speak are all considered public forums under the Liberty of Speech Clause of the California State Constitution, as said areas are basically compatible with free speech.

201.    Ordinance 9.36.020 and Ordinance 9.40.010 and Defendants' enforcement thereof violate the Liberty of Speech Clause  of the California State Constitution

**COMPLAINT**

1   WHEREFORE, Harman respectfully prays the Court grant the equitable and legal relief

2   set forth in the prayer for relief.

3   **X.      PRAYER FOR RELIEF**

4   WHEREFORE, Harman respectfully prays for relief in that this Court:

5   A.      Assume jurisdiction over this action;

6   B.      Enter a judgment and decree declaring Ordinances 9.36.020 and 9.40.010 *et seq.*

7   unconstitutional on their face and as applied to Harman's religious expression, specifically his

8   amplified and unamplified preaching, because they violate Harman's rights and the rights of

9   third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to

10  the United States Constitution;

11  C.      Enter a judgment and decree declaring Ordinances 9.36.020 and 9.40.010 *et seq.*

12  unconstitutional on their face and as applied to Harman's religious expression, specifically

13  amplified and unamplified preaching, because they violates Harman's rights and rights of third

14  parties not before the Court, as guaranteed in the Liberty of Speech Clause in Article 1 of the

15  California State Constitution.

16  D.      Enter a preliminary and permanent injunction enjoining Defendants, their agents,

17  officials, servants, employees, and all persons in active concert or participation with them, or any

18  of them, from applying Ordinances 9.36.020 and 9.40.010 *et seq.* so as to restrict

19  constitutionally-protected speech of speakers, including Harman and other third parties, on the

20  city sidewalks alongside Pacific Avenue, including the sidewalks at Pacific Avenue's

21  intersections with Cooper Street and Soquel Avenue;

22  E.      Adjudge, decree, and declare the rights and other legal relations with the subject

23  matter here in controversy, in order that such declaration shall have the force and effect of final

24

**COMPLAINT**

judgment;

      F.      Award Harman nominal damages in the amount of $1.00 arising from the acts of the Defendants as an important vindication of his constitutional rights;

      G.      Award Harman his costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

      H.      Grant such other and further relief as appears to this Court to be equitable and just.

Dated:  August 3, 2016

                                 Respectfully submitted,

                                 /s/Nathan W. Kellum
                               Nathan W. Kellum*
                               TN Bar #13482, MS Bar #8813
                               Center for Religious Expression
                               699 Oakleaf Office Lane, Suite 107
                               Memphis, TN 38117
                               Telephone: (901) 684-5485
                               Facsimile:  (901) 684-5499

                               Attorney for Plaintiff
                               *Application for Admission *Pro Hac Vice* filed concurrently

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this 3rd day of August, 2016, the foregoing document will be delivered to a process server for service upon defendants.

                               /s/Nathan W. Kellum
                               Attorney for Plaintiff

**COMPLAINT**

1

**VERIFICATION**

2      I, the undersigned, a citizen of the United States and resident of the State of California,

3  have read the foregoing Verified Complaint and declare under penalty of perjury, under the laws

of the State of California, that the foregoing is true and correct.

4      Dated this 26 day of JULY , 2016.

5

6

DONALD HARMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**COMPLAINT**